1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

ANTHONY R. PUGH,

8
                                        Plaintiff,

9           v.

10   KAREN BRUNSON, ELDON VAIL,
     CODY WILSON and MICHAEL
11   DEFOE,

12
                                        Defendants.

No. C09-5180 RJB/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  September 10, 2010**

13
14
15
16
17

        Before the court is the motion for summary judgment of Defendants Karen Brunson,

Cody Wilson, and Eldon Vail.[1]  Dkt. 28.  Plaintiff Anthony R. Pugh has not filed a response.  His

failure to do so may be considered as an admission that the Defendants' motion has merit.  CR

7(b)(2).

18
19
20
21
22

        Defendants argue that Mr. Pugh's claims should be dismissed because he has failed to

allege the personal participation of Defendants Vail and Brunson, his claims are barred by the

favorable termination doctrine, and he has failed to demonstrate that the conditions of his

confinement violated his constitutional rights.

23
24
25

        Having carefully reviewed the parties' pleadings, supporting declarations, and balance of

the record, and viewing the evidence in the light most favorable to Mr. Pugh, the undersigned

recommends that the Defendants' motion for summary judgment be granted.

26

---

[1] Michael DeFoe has not been served in this case, nor has he appeared.  Dkts. 16, 24.

REPORT AND RECOMMENDATION - 1

1

2                                  **SUMMARY OF CASE**

3        In his First Amended Complaint, Mr. Pugh alleges that he was classified for a minimum

4   security promotion with a target date of September 1, 2008.  However, he was not transferred to

5   minimum security and he alleges that this is due to the failure of Defendants Brunson and Vail to

6   properly manage issues of overcrowding and staffing.  Although he recognizes that he has no

7   right to a specific classification, Mr. Pugh claims that he has been forced to commingle with

8   close custody dangerous felons on a daily basis at the Clallam Bay Corrections Center (CBCC),

9

10  which puts his safety in jeopardy.  On November 22, 2008, Mr. Pugh refereed a tag football

11  game between a close-custody inmate team and a medium custody inmate team.  After the game,

12  Marcus David, a close-custody player on the losing team approached Mr. Pugh on the sidelines,

13  yelled at him and punched him in the face.  Mr. Pugh and Mr. David then became embroiled in a

14  fist fight, although Mr. Pugh states that he only fought back to defend himself.  Corrections

15  officers pulled them apart in less than two minutes.  Mr. Pugh alleges that Defendants DeFoe and

16  Wilson, who were present during the game, should have stepped in earlier during the game

17  because it was clear to Mr. Pugh that players were becoming heated and verbally aggressive

18  toward him during the game.  Dkt. 9, p. 3.

19       Mr. Pugh seeks $250,000.00 and an order directing Defendant Vail to separate custody

20  levels, insure safety of inmates, and institute improved staff training.  *Id.*

21

22

23

24

25

26

REPORT AND RECOMMENDATION - 2

**UNDISPUTED FACTS**

Prison records demonstrate that Mr. Pugh was infracted under prison disciplinary rule 505 for fighting and rule 717[2] for resisting officers' efforts to break up the fight. Dkt. 28-2 (Exh. 2, Attachs. A – G) (CM-ECF pagination)[3]. Defendant, Cody Wilson, a Corrections Officer at CBCC, was assigned to observe and supervise inmates playing a flag football game in the recreation yard. The recreation leader, Michael DeFoe was also present. The playing field was on a marked-off area of the main recreational yard at CBCC and was in view of a CBCC tower. Mr. Wilson was tasked with monitoring inmate activities, preventing loitering and milling by inmates in large groups, preventing inmates from talking to other inmates in another recreation yard through the fence, and enforcing the rules of the institution. Dkt. 28-2, Exh. 2, ¶¶ 2-3.

The following description of inmate tag football games in general, and the November 22, 2008 game in particular is provided by Defendant Cody Wilson.

The tag football games are conducted by inmate referees, monitored by a Corrections Officer, the recreation leader and the officer in the tower. Usually, there are three inmates who referee the field, along with two additional inmates who either hold the line and down marker or the clipboard keeping game-related statistical information. All the referees wear uniforms. Dkt. 28-2, Exh. 2, ¶ 3. During the game, the players wear two cloth flags attached with velcro to their belts. *Id.*, ¶ 5.

Inmate players are not allowed to challenge the referees during the games, including arguing over calls or yelling profanity at the referees. If the inmate players do so, they are removed from the field and escorted back to their housing unit. *Id.*, ¶ 3. Prior to the game, the

---

[2] Serious infractions are listed under Wash. Admin. Code §137-25-030.

[3] For ease of reference, all citations are to CM/ECF numbering instead of the internal numbering of Defendants' exhibits and attachments.

REPORT AND RECOMMENDATION - 3

recreation leader admonishes the players to follow the rules, follow the decisions of the referees, and to play with respect for each other.  They are also warned that if they break the rules, they will be escorted off the field and returned to the unit.  This admonishment was given prior to the game on November 22, 2008.  *Id.*, ¶ 4.

On November 22, 2008, the field was quite muddy as there had been a significant amount of rain prior to the game.  That day, the inmates were called to yard at approximately 8:45 a.m. and the game started at approximately 9:00 a.m.  The yard period was to last until 10:00 a.m. that day.  The game that day was between a team from a housing unit in medium custody and another team from a unit in close custody.  Close custody is a higher level of custody.  Inmate Marcus David was on the team from the close custody unit.  CBCC has both types of housing units. Inmates from both levels of custody play in intramural sports.  They also work in correctional industries jobs.  They also attend religious worship and educational programs alongside each other.  *Id.*, ¶ 5.

On November 22, 2008 there were three referees, along with two additional inmates who held the line and down marker and the clipboard keeping game-related statistical information. Mr. Pugh did not speak to Mr. Wilson regarding any concerns Mr. Pugh had about other referees who were on the field that day or regarding concerns he had while the game was in progress.  *Id.*, ¶ 6.  Mr. Wilson did not observe any incident during the game that required intervention on his part.  He did not remove any inmate from the field or send any inmate back to his unit and he did not observe anything that would have required him to do so.  He walked around the field during the game and observed the recreation yard from the sidelines of the playing field.  At times, he stood next to Mr. DeFoe and other times, he did not.  He was not a party to any conversation

REPORT AND RECOMMENDATION - 4

between Mr. Pugh and Mr. DeFoe.  Mr. Pugh did not discuss any concerns he had with

Defendant Wilson at any time before or during the game.  *Id.*, ¶ 7.

In an eight month period leading up to November 22, 2008, Mr. Wilson had observed a

large number of flag football games between inmates and he did not observe any fights in any of

those games.  However, there were occasions when he removed inmates from the field and

returned them to their housing units for misconduct.  *Id.*, ¶ 8.

Before the fight broke out at 9:56 a.m., the game had proceeded without incident for

almost one hour.  *Id.*, ¶ 9.  Shortly after the game concluded, while Mr. Wilson was assisting in

picking up equipment, he observed Mr. Pugh exchanging closed fist punches to the upper body

with Marcus David.  Mr. Wilson immediately made radio notification to CBCC Major Control

on his communication device.  He then gave verbal directives to both offenders to stop fighting

and within a few seconds, ran to the area where Mr. Pugh and Mr. David were fighting, along

with Recreation Leader DeFoe.  Despite Mr. Wilsons' directive, Mr. Pugh continued fighting

and both he and Mr. David fell to the ground, continuing to throw closed fist punches.  Very

quickly and in response to Mr. Wilson's radio call, Corrections Officers Howell and Hubbart

arrived to help break up the fight.  Officers Howell and Wilson pulled Mr. David of off Mr.

Pugh, while Officer Hubbart and Recreation Leader DeFoe pulled Mr. Pugh on his back before

rolling him on to his stomach so that handcuffs could be applied.  Two additional officers arrived

after Mr. Pugh and Mr. David were separated.  Mr. Pugh and Mr. David were directed to remain

on the ground until after the additional officers arrived.  *Id.*, ¶ 10.

Both Mr. Pugh and Mr. David were escorted to the segregation unit.  A third offender

was placed in segregation for his role in encouraging Mr. David to fight.  Later that day, Mr.

Wilson filed a serious infraction report against Mr. Pugh, infracting him under disciplinary rules

REPORT AND RECOMMENDATION - 5

505 (fighting), and 717 (causing a threat of injury to another person by resisting orders, resisting

assisted movement or physical efforts to restrain).   The other two offenders also received

infractions.  *Id.*, ¶ 11.

Mr. Pugh was found "guilty" of the 505 violation, but "not guilty" of the 717 violation at

his disciplinary hearing.   Dkt. 28-2, p. 12 (Exh. 2, Attach. C)  As part of his sanction, Mr. Pugh

received loss of 25 days good conduct time.  *Id.*  Mr. Pugh challenged the results of the

disciplinary hearing in a personal restraint petition, filed in the Washington State Court of

Appeals.  The Court of Appeals Chief Judge dismissed the petition as frivolous under Wash. R.

App. Proc. § 16.11, determining that sufficient evidence supported the finding of guilt entered by

the hearings officer.   Dkt. 28-2, pp. 28-29.  Mr. Pugh did not appeal the Court of Appeals

determination, as evidenced by the Certificate of Finality entered by the Court of Appeals after

the period for submitting a petition for review to the Washington Supreme Court (30 days) had

lapsed. Dkt. 28-2, p. 31.

In its Order Dismissing Petition, the Washington Court of Appeals summarized the facts

and upheld the infraction as follows:

> Anthony Pugh seeks relief from the sanctions imposed following the
> Department of Corrections' determination that he had committed a disciplinary
> infraction.  On November 22, 2008, Corrections officers saw Pugh and another
> inmate exchanging closed fist punches.  They continued to fight after officers
> directed them to stop.  The Department issued an Initial Serious Infraction Report
> asserting that Pugh had violated WAC 137-28-260(505) (fighting with another
> person) and WAC 137-28-260(717) (resisting orders).  During his infraction
> hearing, Pugh argued that he had been attacked by the other inmate and was only
> defending himself.  The Department hearing officer found that he had committed
> the 505 infraction, based on staff written testimony, but had not committed the
> 717 infraction.  The hearing officer imposed disciplinary sanctions of 15 days of
> segregation and 25 days loss of good conduct time.  Pugh appealed to the
> superintendent, who affirmed the finding and the sanctions.

REPORT AND RECOMMENDATION - 6

Pugh argues that he should not have been found guilty of the 505 infraction because he was defending himself. This court will uphold a prison disciplinary decision so long as some evidence supports it. *Superintendent v. Hill*, 472 U.S. 445, 455, 105 S. Ct. 2768, 86 L. Ed.2d 256 (1985); *In re Reismiller*, 101 Wn.2d 291, 294, 678 P.2d 323 (1984). Even if the altercation began as Pugh describes, as having been attacked by another inmate after a football game, Pugh and the other inmate continued fighting after being instructed to stop. The Department presented some evidence to support the 505 infraction.

Dkt. 28-2, pp. 28-29.

Mr. Pugh's deposition was taken in this case. At his deposition, he testified that he refereed the flag football game with other inmates who were not as experienced as him (*Id.,* pp. 43-44) and that the game was supervised by Officer Wilson, Recreation Leader DeFoe, and an officer in the tower having view of the playing field. *Id.*, pp. 46-47. He spoke to Mr. DeFoe at different times during the game, discussing concerns he had about the levels of contentiousness by the players exhibited on the field. Mr. Pugh's conversations, including during the halftime period, were with Mr. DeFoe, not with Officer Wilson. Mr. Pugh noticed inmates were contesting his calls on the field, but that inmates were not removed from the game and escorted off the field in response. *Id.*, pp. 48-49. Mr. Pugh did not know Mr. Marcus prior to the football game, nor did he have difficulty with other inmates from the close custody portion of CBCC prior to that day. *Id.*, pp. 45-46, 58.

Mr. Pugh testified that he heard Mr. Marcus refer to him as a punk (or by similar words) while Mr. Pugh was picking up equipment after the game. Mr. Pugh turned toward Mr. Marcus and asked him what he said. He testified that that was when Mr. Marcus punched him in the mouth, resulting in the fight that followed. Mr. Pugh admits to throwing punches at Mr. Marcus, but contends that he did so in self-defense. He also admits to being restrained by responding officers who arrived to break up the fight in less than two minutes. *Id.*, pp. 52-56.

REPORT AND RECOMMENDATION - 7

1

**STANDARDS OF REVIEW**

2

**A.     Summary Judgment Standard**

3

Summary judgment will be granted when there is no genuine issue as to any material fact

4

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party

5

seeking summary judgment bears the initial burden of informing the court of the basis for its

6

motion, and of identifying those positions of the pleadings and discovery responses that

7

demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

8

317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  Where the moving party will have the burden

9

of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

10

than for the moving party.  *Calderone v. United States*, 788 F.2d 254, 259 (6th Cir. 1986).  On an

11

issue where the nonmoving party will bear the burden of proof at trial, the moving party can

12

prevail merely by pointing out to the district court that there is an absence of evidence to support

13

the non-moving party's case.  *Celotex*, 477 U.S. at 325.

14

If the moving party meets its initial burden, the opposing party must then set forth

15

specific facts showing that there is some genuine issue for trial in order to defeat the motion.

16

*Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S. Ct. 2502, 91 L.Ed.2d 202 (1986).  "A

17

plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting

18

that belief, is no more than speculation or unfounded accusation about whether the defendant

19

really did act from an unlawful motive." *Carmen v. San Francisco Unified School Dist.*, 237

20

F.3d 1026, 1028 (9th Cir. 2001).

21

**B.     42 U.S.C. § 1983**

22

To state a claim under 42 U.S.C. § 1983, at least two elements must be met: (1) the

23

defendant must be a person acting under color of state law, and (2) his conduct must have

24

25

26

REPORT AND RECOMMENDATION - 8

1  deprived the plaintiff of rights, privileges, or immunities secured by the constitution or laws of

2  the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Implicit in the second element is

3  a third element of causation. *See Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 286-87,

4  (1977); *Flores v. Pierce*, 617 F.2d 1386, 1390-91 (9th Cir. 1980), *cert. denied*, 449 U.S. 975

5  (1980). When a plaintiff fails to allege or establish one of the three elements, his complaint must

6  be dismissed. The Civil Rights Act, 42 U.S.C. § 1983, is not merely a "font of tort law."

7  *Parratt*, 451 U.S. at 532. That plaintiff may have suffered harm, even if due to another's

8  negligent conduct, does not in itself necessarily demonstrate an abridgement of constitutional

9

10  protections. *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986).

### DISCUSSION

11

12  **A.      Personal Participation of Defendants Vail and Brunson**

13

14          To obtain relief against a defendant, Mr. Pugh must prove the particular defendant has

15  caused or personally participated in causing the deprivation of a particular protected

16  constitutional right. *Arnold v. International Business Machines Corp.,* 637 F.2d 1350, 1355 (9th

17  Cir. 1981); *Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir. 1977). To be liable for "causing"

18  the deprivation of a constitutional right, the particular defendant must commit an affirmative act,

19  or omit to perform an act, which he or she is legally required to do, which causes the plaintiff's

20  deprivation. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

21

22          In order to state a civil rights claim, a plaintiff must set forth the specific factual bases

23  upon which he claims each defendant is liable. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir.

24  1980). A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of

25  supervisory responsibility or position. *Monell v. New York City Dept. of Social Services*, 436

26  U.S. 658, 694 n.58 (1978); *Padway v. Palches*, 665 F.2d 965 (9th Cir. 1982). Vague and

REPORT AND RECOMMENDATION - 9

1   conclusory allegations of official participation in civil rights violations are not sufficient to

2   withstand a motion to dismiss.  *Pena v. Gardner*, 976 F.2d 469, 471 (9th Cir. 1992).  The inquiry

3   into causation must be individualized and focus on the duties and responsibilities of each

4   individual defendant whose acts or omissions are alleged to have caused a constitutional

5   deprivation.  *Rizzo v. Goode*, 423 U.S. 362, 370-71 and 375-77 (1976); *Leer v. Murphy*, 844 F.2d

6   628 (9th Cir. 1988).  Sweeping conclusory allegations against an official are insufficient to state

7   a claim for relief.  The plaintiff must set forth specific facts showing a causal connection

8   between each defendant's actions and the harm allegedly suffered by plaintiff.  *Aldabe*, 616 F.2d

9   at 1092; *Rizzo*, 423 U.S. at 371.

10

11      Defendants in a 42 U.S.C. § 1983 action cannot be held liable based on a theory of

12   respondeat superior or vicarious liability.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981);

13   *Bergquist v. County of Cochise*, 806 F.2d 1364, 1369 (9th Cir. 1986).  Absent some personal

14   involvement by the defendants in the allegedly unlawful conduct of subordinates, they cannot be

15   held liable under § 1983.  *Johnson*, 588 F.2d at 743-44.

16

17      Mr. Pugh testified that he is suing Defendants Brunson and Vail because they failed to

18   transfer him from CBCC; address overcrowding issues at CBCC and other institutions; and,

19   separate close-custody inmates from medium-custody inmates.  *Id.*, pp. 56-58.  He also testified

20   that neither Defendant Brunson or Vail were present at the game, played a role in breaking up the

21   fight, nor were responsible for avoiding the fight.  Dkt. 28-2, p. 58.

22

23      Mr. Pugh fails to demonstrate personal participation on the part of either Secretary Vail

24   or Former Superintendent Brunson.  Mr. Pugh fails to describe the personal participation of

25   either of these defendants and has provided no evidence of their involvement in denying his

26   transfer or the fight during the flag football game.  Knowledge and acquiescence in a

REPORT AND RECOMMENDATION - 10

1   subordinate's unconstitutional conduct is insufficient; government officials, regardless of their

2   title, can only be held liable under § 1983 for his or her own conduct and not the conduct of

3   others.  *See Ashcroft v. Iqbal*, ---U.S. ----, ----, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

4   "[A] plaintiff must plead that each Government-official defendant, through the official's own

5   individual actions, has violated the constitution."  *Iqbal*, 129 S.Ct. at 1948.

6           Defendants Vail and Brunson cannot be liable for the actions or inactions of their

7   subordinates.  They can only be held liable for their own actions or lack of action.  Other than

8   conclusory allegations that these individuals should be held responsible for an alleged

9   overcrowding of institutions across the state of Washington, Mr. Pugh has provided no evidence

10  showing that these defendants should be held personally liable.  Accordingly, the undersigned

11  recommends that Mr. Pugh's claims against Defendants Vail and Brunson be dismissed with

12  prejudice.

13  **B.      Favorable Termination Doctrine - Damages for Lost Good Time**

14          To the extent that Mr. Pugh seeks recovery for the consequences of his prison

15  disciplinary hearing, such claims are foreclosed by the favorable termination doctrine.   To the

16  extent Mr. Pugh seeks a judgment including an award of damages which would necessarily

17  imply that his confinement resulting from his prison disciplinary action was invalid, his claims

18  are not cognizable under 42 U.S.C. § 1983.   *Heck v. Humphrey*, 512 U.S. 477, 489 (1994).   A

19  civil rights action under Section 1983 is the proper vehicle to challenge conditions of

20  confinement; a habeas corpus petition is the sole federal vehicle for challenging the fact or

21  duration of confinement.  *Id*. at 498-99.

22          Mr. Pugh challenged the infraction and loss of good time in a personal restraint petition

23  in the Washington Court of Appeals, but the infraction and sanction were upheld.  Dkt. 28-2, pp.

REPORT AND RECOMMENDATION - 11

28-29.  Mr. Pugh did not appeal from that finding.  Thus, his period of confinement as extended by the sanction imposed has not previously been held invalid and his claims are not cognizable under 42 U.S.C. 1983.   To the extent Mr. Pugh seeks damages for his commitment, his claims are also barred.

Although Mr. Pugh does not directly address the substantive merits of his underlying civil commitment, he does challenge the circumstances surrounding imposition of the infraction and sanction. He alleges that he was only defending himself and that officers failed to intervene in an escalating situation on the football field.  Thus, a judgment in his favor would "necessarily imply the invalidity" of the infraction and ensuing loss of good time.  As was explained by the Ninth Circuit in *Huftile*:

> The Supreme Court has instructed, however, that *Heck* envisioned "the possibility ... that the nature of the challenge to the procedures could be such as necessarily to imply the invalidity of the judgment."  *Edwards v. Balisok*, 520 U.S. 641, 645, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997).  In *Balisok*, the alleged procedural violations involved a hearing officer's decision, motivated by "deceit and bias," to exclude exculpatory evidence in a disciplinary proceeding.  *Id*. at 646-47, 117 S. Ct. 1584. The *Balisok* Court reasoned that a "criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him."  *Id*. at 647, 117 S. Ct. 1584.  It therefore concluded that Balisok's § 1983 claim for declaratory relief and money damages necessarily implied the invalidity of the disciplinary action and rendered his claim not cognizable under *Heck*.  *Id*. at 648, 117 S. Ct. 1584.

*Huftile,* 410 F.3d at 1140.

Regardless of whether a plaintiff is directly seeking release from confinement, if an injunctive or monetary judgment in favor of the plaintiff would necessarily imply that the confinement is invalid, the action is not cognizable absent a prior determination of invalidity of the confinement. *Heck*, 512 U.S. at 487.

REPORT AND RECOMMENDATION - 12

Here, it can be inferred that Mr. Pugh seeks recovery for the consequences of his prison disciplinary hearing.  To the extent that he does so, he claims are foreclosed by the favorable termination doctrine. To the extent he seeks judgment including an award of damages which would necessarily imply that his confinement resulting from his prison disciplinary action was invalid, his claims are not cognizable under 42 U.S.C. § 1983.  *Heck*, 512 U.S. at 489.

Accordingly, the undersigned recommends that these claims be dismissed without prejudice.

**C.      Prison Transfer and/or Classification**

Mr. Pugh has no constitutional right to a particular classification, cutody level, or to be incarcerated in a particular prison.

In *Schroder v. McDonald*, 55 F.3d 454, 462 (9th Cir.1995), the Ninth Circuit held that a state prison may transfer an inmate back to a more secure facility despite a prison regulation requiring him to be held in the least restrictive confinement.   The Court also noted that prison administrators retain broad discretion over the transfer of inmates, therefore, no liberty interests were triggered.  Courts have consistently held that inmates are not entitled to due process protections in relation to discretionary transfers between prison facilities. *See Montayne v. Haymes*, 427 U.S. 236, 242-43, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1978) (finding no constitutional right to be housed in a particular state prison); *Meachum v. Fano*, 427 U.S. 215, 224, 96 S. Ct. 2532, 49 L.Ed.2d 451 (1976) (holding that no due process protections were required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a "grievous loss" upon the inmate).  Prisoners have no inherent constitutional right to placement in any particular prison; transfers to any particular prison; any particular security classification; or housing assignment.  *See Olim v. Wakinekona*, 461 U.S. 238, 245, 103

REPORT AND RECOMMENDATION - 13

S. Ct. 1741, 75 L.Ed.2d 813 (1983) ("[J]ust as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State."). Due process rights are only triggered by the deprivation of a legally cognizable property interest. *Mitchell v. Horn*, 318 F.3d 523, 531 (3rd Cir.2003). Prisoners generally do not have a due process liberty interest in their placement and classification while incarcerated. *See Moody v. Daggett*, 429 U.S. 78, 88 n. 9, 97 S. Ct. 274, 50 L.Ed.2d 236 (1976); *White v. Lambert,* 370 F.3d 1002, 1013-1014 (9th Cir.2004) (there is no constitutional right to imprisonment in a specific prison).

Thus, Mr. Pugh does not have a constitutional right to be transferred to a facility more desirable to him or to a classification that would allow for such a transfer. Accordingly, the undersigned recommends that Mr. Pugh's claims regarding his classification level and denial of transfer should be dismissed.

**D.    Overcrowding and "Co-Mingling" of Prisoners**

Mr. Pugh alleges that he was injured in the flag football game because he forced to "commingle" with more dangerous convicted felons; a situation that he apparently would not face if he were transferred from CBCC.

The Eighth Amendment protects inmates from cruel and unusual punishment. Harsh prison conditions may constitute cruel and unusual punishment unless such conditions are inherent in the fact of conviction. *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment standard requires proof of both the objective and subjective component. *Hudson v. McMillian*, 503 U.S. 1 (1992). First, the deprivation alleged must objectively be sufficiently serious, resulting in a denial of the "minimal

REPORT AND RECOMMENDATION - 14

civilized measures of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes*, 452 U.S. at 347). "Only extreme deprivations are adequate to satisfy the objective component of any Eighth Amendment claim." *Rish v. Johnson*, 131 F.3d 1092, 1096 (9th Cir. 1997).

In proving the objective component an inmate must establish that there was both some degree of actual or potential injury, and that society "considers the [acts] that the plaintiff complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly [to those acts]." *Helling v. McKinney*, 509 U.S. 25, 36 (1993); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976). The subjective component requires that the prison official possesses a sufficiently culpable state of mind: "deliberate indifference to inmate health and safety." *Farmer*, 511 U.S. at 834-36. With regard to deliberate indifference a prison official is not liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of *serious harm* exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837 (emphasis added).

If one of the components is not established, the court need not inquire as to the existence of the other. *Helling v. McKinney*, 509 U.S. 25 (1993). "It is obdurance and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clauses . . . ." *Wilson v. Seiter*, 501 U.S. 294, 299 (1991) (citing *Whitley*, 475 U.S. at 319).

Overcrowding is not unconstitutional per se, but it can result in certain effects that form the basis for a constitutional violation. *Hoptowit v. Ray*, 682 F.2d 1237, 1249 (9th Cir.1982). These effects include increased violence, the reduction of other constitutionally required services

REPORT AND RECOMMENDATION - 15

1   such that they fall below Eighth Amendment standards, and the deterioration of shelter to the

2   point that it is unfit for human habitation.  *Id.*; *see also Akao v. Shimoda*, 832 F.2d 119, 120 (9th

3   Cir.1987) (per curiam) (reversing district court's dismissal of claim that overcrowding caused

4   increased stress, tension, communicable disease, and confrontation between inmates); *Toussaint*

5   *v. Yockey*, 722 F.2d 1490, 1492 (9th Cir.1984) (constitutional violation may occur as a result of

6   overcrowded prison conditions engendering violence, tension, and psychiatric problems).

7           Aside from a general allegation that Defendants Vail and Brunson should be held

8   responsible for overcrowding at CBCC and in institutions across the state, there is no evidence

9   that Mr. Pugh was subjected to overcrowded conditions at the CBCC.  A liberal construction of

10  his complaint is that Mr. Pugh was denied his transfer to a medium-security prison because of

11  these unexplained crowding conditions, but there is no evidence in the record that this is, in fact,

12  so.  There is no evidence that the CBCC is overcrowded or that if it is, the overcrowding led to

13  deprivations implicating the Eighth Amendment.  Plaintiff has presented no specific facts or

14  evidence supporting his claim that overcrowding or CBCC's program allowing inmates of

15  differing classification levels to use the same facilities during events led to increased tension or

16  violence during the flag football game.  In fact, the record reflects no incidents of increased

17  violence and Plaintiff admits that he engaged in the fist fight with the other inmate albeit that he

18  responded in self-defense.

19          As noted above, Mr. Pugh cannot seek recovery under due process for his level or

20  custody or housing assignment.  Similarly, Mr. Pugh cannot seek recovery under these same

21  facts under the Eighth Amendment.   Consequently, the undersigned recommends that

22  Defendants be granted summary judgment on these claims.

REPORT AND RECOMMENDATION - 16

**E.      Protection From Harm During Flag Football Game**

To impose liability on the Defendants for the incident involving the fight on the flag football field, Mr. Pugh must demonstrate that the Defendants acted with deliberate indifference with regard to threats to his safety. *Redman v. County of San Diego*, 942 F.2d 1435, 1443 (9th Cir. 1991). Under the Eighth Amendment, the test is whether the Defendants, acting with deliberate indifference, exposed Mr. Pugh to a sufficiently substantial "risk of serious damage to his future health." *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). To show deliberate indifference, Mr. Pugh must show the Defendants' knowledge of a serious harm and that the Defendants acted or failed to act despite that knowledge. *See Farmer*, 511 U.S. at 842. Even with knowledge of the risk, and with an injury occurring as a result of the risk, liability may not be imposed if the Defendants show that they acted reasonably in the face of the risk. *Id*. at 844.

Prior to the fight on November 22, 2008, Mr. Pugh never had a problem with a close-custody offender. Dkt. 28-2, p. 58. Mr. Pugh admits that he had never met or had any dealings with Mr. March prior to the football game on November 22, 2008. Dkt. 28-2, p. 45. Mr. Pugh did testify that some players were unhappy with his referee calls and verbally expressed their disagreement, but he relayed this information only to Mr. DaFoe. *Id.*, p. 48. He also testified that it took less than one minute before Officer Wilson told them to stop fighting and less than two minutes before additional corrections officers arrived to end the fight. *Id.*, p. 55.

Mr. Pugh has failed to demonstrate that Defendants Vail, Brunson or Wilson were aware of facts from which an inference can be drawn that a substantial risk of serious harm existed during the flag football game or that they were aware of a substantial risk of serious harm arising from a game between inmates of differing custody levels. There is no evidence that Officer

Wilson was aware of any concerns Mr. Pugh may have had during the game and in fact, Defendant Wilson testified that there were no incidents during the game that required his intervention until the fight between Mr. Pugh and Mr. David.

Therefore, the undersigned recommends that Defendants be granted summary judgment on Mr. Pugh's Eighth Amendment claims.

**F.     Qualified Immunity**

Defendants contend that they are entitled to qualified immunity as to Plaintiff's constitutional claims.  "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).  The court evaluates a defendant's qualified immunity defense using a two-step inquiry.  *Id*.  However, the Supreme Court recently held that this two-step inquiry is no longer an inflexible requirement.  *Pearson v. Callahan*, ---U.S. ---, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (explaining "that, while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory").  It is within our "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id*.

Under *Saucier's* first prong, the court must determine whether, viewing the facts in the light most favorable to the plaintiff, the government employees violated the plaintiff's constitutional rights.  *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.  If the court determines that a constitutional violation has occurred, under *Saucier's* second prong, it must determine whether the rights were clearly established at the time of the violation.  *Id*.  For a right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand

REPORT AND RECOMMENDATION - 18

that what he is doing violates the right." *Id*. at 202, 121 S.Ct. 2151 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).  The protection afforded by qualified immunity "safeguards 'all but the plainly incompetent or those who knowingly violate the law.'"  *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir.1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

The court has concluded that Defendants did not violate Mr. Pugh's constitutional rights. Therefore, it is not necessary to address Defendants' qualified immunity arguments.

## CONCLUSION

The undersigned recommends that Defendants' motion for summary judgment (Dkt. 28) be **GRANTED** and that the Plaintiff's claims against the Defendants as discussed herein be **Dismissed with Prejudice.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **September 10, 2010**, as noted in the caption.

DATED this  16th  day of August, 2010.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 19